# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

—————————————————————————X

JOHN DOE                                           **Civil Action No.:**

              Plaintiff,                           **COMPLAINT**

       v.

EAST CAROLINA UNIVERSITY, CECIL STATON, JR.
individually and as agent for East Carolina University,
VIRGINIA HARDY, individually and as agent
for East Carolina University, TAMIKA WORDLOW,
individually and as agent for East Carolina University,
CAITLIN BUTLER, individually and as agent for East        **JURY TRIAL**
Carolina University, LYNN ROEDER, individually            **DEMANDED**
and as agent for East Carolina University,
HEIDI S. BONNER, individually and as agent for East
Carolina University, KATHLEEN FLANAGAN, individually
and as agent for East Carolina University,
CHRISTINA RAGONE, individually and as agent for
East Carolina University, PATRICK SKIPPER, individually
and as agent for East Carolina University,
BRET WILSON, individually and as agent for East
Carolina University, MANDY MESSERLI, individually
and as agent for East Carolina University,
and JOHN BELLFLOWER, JR., individually and as agent
for East Carolina University.

              Defendants.

—————————————————————————X

       Plaintiff John Doe,[1] by and through his attorneys, Nesenoff & Miltenberg, LLP and White

& Allen, as and for his Complaint against Defendants East Carolina University, Cecil Staton, Jr.,

Virginia Hardy, Tamika Wordlow, Caitlin Butler, Lynn Roeder, Heidi S. Bonner, Kathleen

Flanagan, Christina Ragone, Patrick Skipper, Bret Wilson, Mandy Messerli and John Bellflower,

Jr. respectfully alleges as follows:

_____

[1] Plaintiff has filed herewith a motion to for leave to proceed anonymously.

**THE NATURE OF THIS ACTION**

1.      This action arises from the actions taken and procedures employed by Defendants East Carolina University ("ECU" or the "University"), Cecil Staton, Jr. Virginia Hardy, Tamika Wordlow, Caitlin Butler, Lynn Roeder, Heidi S. Bonner, Kathleen Flanagan, Christina Ragone, Patrick Skipper, Bret Wilson, Mandy Messerli and John Bellflower, Jr. in investigating and adjudicating a complaint of sexual misconduct filed by Jane Roe[2] alleging that John Doe had non-consensual sexual contact with her in the early morning hours of November 21, 2015.

2.      This action is based upon Title IX reverse discrimination, constitutional due process and related state law claims brought on behalf of Plaintiff John Doe ("Plaintiff" or "John Doe"), a former graduate student at Defendant ECU, who was found responsible for violating ECU's policies related to sexual misconduct and subjected to a three (3) year suspension from the University, which is tantamount to an expulsion.

3.      As a result of Defendants' imposition of the unwarranted and erroneous sanction against John Doe, he has sustained damages to his reputation, future education and career prospects, physical, psychological and emotional damages, economic injuries, and the loss of educational and career opportunities.

4.      Defendants' investigation and adjudication of Jane Roe's allegations were tainted by gender bias resulting from federal and local pressure to protect female victims of sexual violence, and to reform ECU's policies to take a hard line against male students accused of sexual misconduct. Participants in the investigation and adjudication of the allegations against John Doe were trained by organizations that teach a gender biased, trauma informed approach to university Title IX proceedings. The hearing panel that "heard" John Doe's case was stacked with faculty

---

[2] Roe is referred to herein pseudonymously.

and staff who engaged in advocacy work for female equality and tougher prosecution of male perpetrators accused of sexual violence against women. The sole adjudicator of John Doe's appeal was also tasked as ECU's spokesperson for Title IX compliance as a result of an Office of Civil Rights investigation and an advocate for women's rights, having a direct conflict of interest with deciding John Doe's appeal. John Doe was subjected to hostility, harassment and intimidation throughout the investigation and adjudication process.

5.      John Doe was presumed guilty from the beginning, subjected to a six-month long process at the hands of biased and inept administrators and deprived of a fair and impartial hearing with adequate due process protections, as mandated by Title IX, the United States Constitution and ECU's policies and procedures. When Defendants subjected John Doe to disciplinary action they did so in an arbitrary and capricious way, deprived him of due process and discriminated against him because of his gender. ECU's policies and regulations as promulgated are biased and discriminatory. While Defendants significantly departed from these policies and regulations in John Doe's case, the regulations and policies they did follow are insufficient to protect the rights of male students accused of sexual misconduct.

6.      John Doe therefore brings this action to obtain relief based on claims for violations of Title IX of the Education Amendments of 1972, violation of Fourteenth Amendment Procedural Due Process and breach of contract.

## THE PARTIES

7.      John Doe is a natural person and resident of North Carolina.

8.      Defendant East Carolina University is a public university located in Greenville, North Carolina. It has been designated a sea grant university by the Association of Public and Land Grant Universities. ECU is a constituent university of the University of North Carolina. It is

authorized, supervised and funded by the State of North Carolina pursuant to the North Carolina Constitution and Section 116-4 of the North Carolina General Statutes.

9.      Defendant Cecil Staton Jr. ("Staton") is the Chancellor of ECU. The Board of Governors of the University of North Carolina have granted Staton the power and authority to manage student conduct at ECU. Upon information and belief, Staton is the party authorized to expunge the sanction issued against Plaintiff from his education records and the University of North Carolina database.

10.      Defendant Virginia Hardy ("Hardy") is a natural person and, upon information and belief, a resident of the State of North Carolina. She is ECU's Vice Chancellor of Student Affairs and was singularly responsible for deciding John Doe's appeal.

11.      Defendant Tamika Wordlow ("Wordlow") is a natural person and, upon information and belief, a resident of the State of North Carolina. She is the Director of ECU's Office of Student Rights and Responsibilities and, among other things, was responsible for the initiation of a Title IX investigation against John Doe, as well as ensuring compliance with ECU's policies and procedures in the investigation and adjudication of sexual misconduct allegations against him, which took six months.

12.      Defendant Caitlin Butler ("Butler") is a natural person and, upon information and belief, a resident of North Carolina. Butler replaced Kristan Tucker as the Title IX investigator on John Doe's case in or around January 2016 and was the sole investigator assigned to John Doe's case even though she lacked experience in the area.

13.      Defendant Lynn M. Roeder ("Roeder") is a natural person and, upon information and belief, a resident of North Carolina. Roeder is ECU's Dean of Students and denied John Doe's appeal of an administrative suspension and ban from ECU properties effected by ECU in Fall

4

2015, which also resulted in denying John Doe access to his medical provider, whose office was located on ECU property.

14. Defendant Heidi S. Bonner ("Bonner") is a natural person and, upon information and belief, a resident of North Carolina. Bonner, a criminal justice professor, was a member of the panel at the Student Conduct Board hearing ECU held in John Doe's case.

15. Defendant Kathleen Flanagan ("Flanagan") is a natural person and, upon information and belief, a resident of North Carolina. Flanagan was a member of the panel at the Student Conduct Board hearing ECU held in John Doe's case.

16. Defendant Christina Ragone ("Ragone") is a natural person and, upon information and belief, a resident of North Carolina. Ragone was a member of the panel at the Student Conduct Board hearing ECU held in John Doe's case.

17. Defendant Patrick Skipper ("Skipper") is a natural person and, upon information and belief, a resident of North Carolina. Skipper was a member of the panel at the Student Conduct Board hearing ECU held in John Doe's case.

18. Defendant Bret Wilson ("Wilson") is a natural person and, upon information and belief, a resident of North Carolina. Wilson was a member of the panel at the Student Conduct Board hearing ECU held in John Doe's case.

19. Defendant Mandy Messerli ("Messerli") is a natural person and, upon information and belief, a resident of North Carolina. Messerli is the Associate Director of ECU's Office of Student Rights and Responsibilities and served as the hearing advisor at John Doe's Student Conduct Board hearing.

20. Defendant John Bellflower, Jr. ("Bellflower") is a natural person and, upon information and belief, a resident of North Carolina. At all times relevant to the claims alleged

5

herein, Bellflower was an Associate University Attorney at ECU. Bellflower directed ECU administrators to deny John Doe access to his education file, participated in John Doe's Student Conduct Board hearing in violation of ECU's policy and procedures and repeatedly referenced "litigating" the case against John Doe in order to determine his guilt. Upon information and belief, Bellflower was terminated or resigned from his position in or around March 2018.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States and presents a federal question. This Court further has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a).

22.     Venue is proper in the Eastern District of North Carolina judicial district pursuant to 28 U.S.C. 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in this judicial district and division.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.     2014: ECU Faces Federal Pressure to Comply With Title IX**

### A.  The U.S. Department of Education's "Call to Action" to U.S. Colleges and Universities

23.     On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at p. 4.

6

24.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

25.     The DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

26.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the

procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31. While the Q&A advised that "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights…a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." *Id.* at p. 13.

27.     In April 2014, the White House issued a report entitled "Not Alone", which included a warning that if the OCR finds that a Title IX violation occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

28.     In June 2014, then Assistant Secretary of Education Catherine Llhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it may elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. To support enforcement of the DCL the OCR hired hundreds of additional investigators. To date, OCR has conducted 458 investigations of colleges for the potential mishandling of complaints of sexual violence. https://projects.chronicle.com/titleix/

29.     On September 1, 2014 the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle

of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

### B. OCR Opens An Investigation At ECU

30.     On October 8, 2014, a female student filed a complaint against ECU alleging that ECU subjected her to a sexually hostile environment because it failed to discipline a University Professor who sent her suggestive messages, asked her out on dates and engaged in other "inappropriate" behavior.

31.     In response, OCR launched an investigation into ECU's sexual harassment and sexual misconduct policies. Because the complainant was a student, OCR reviewed the sexual misconduct policy applying to students, *The Interim Regulation on Responding to Complaints of Sexual Harassment, Sexual Misconduct and/or Discrimination on the Basis of Sex,* to determine whether the procedures set forth therein were compliant with Title IX.

32.     OCR concluded that ECU's sexual harassment policies and procedures violated Title IX because they did not provide for the prompt resolution of complaints and that ECU's delays in completing investigations—due to personnel issues—were not reasonable.

33.     OCR further concluded that ECU's Title IX Coordinator lacked "sufficient knowledge of the University's grievance procedures on sex discrimination."

34. The OCR investigation concluded in February 2016 after ECU agreed to implement a resolution agreement which "OCR would monitor closely …to ensure that the commitments made are implemented timely and effectively." If ECU failed to implement the terms of the resolution agreement then OCR could "initiate administrative enforcement or judicial proceedings" against the University.

35. Pursuant to the February 2016 resolution agreement, ECU agreed to revise its Title IX policies and procedures "to ensure for the prompt and equitable resolution of allegations of sex discrimination, including sexual harassment, gender-based harassment, and sexual violence as required by Title IX." ECU was further required to provide all students with written notice regarding the policy revisions, as well as information about how to obtain copies of relevant policies and procedures.

36. ECU further agreed to specify the responsibilities of its Title IX Coordinator and corresponding training requirements, including "ensuring that the Coordinator and any deputies will not have other responsibilities that create a conflict of interest."

37. ECU also agreed to train staff on "the University's responsibilities under Title IX to address allegations of sexually inappropriate behaviors."

38. Upon information and belief, OCR presently monitors ECU's Title IX compliance.

## II.    ECU Title IX Training and Potential for Gender Bias

39. ECU's Title IX compliance officers, along with its Victim Advocates are, upon information and belief, responsible for training ECU's Title IX investigators, and Student Conduct Board members to use a "trauma informed approach" in "responding to sexual misconduct." ECU personnel also refer to this as "sensitivity training."

40. Attendees are taught that sexual assault victims may give conflicting accounts of what happened to them because their brains are impacted by trauma—preemptively setting up an excuse for any credibility issues that may arise during the course of an investigation and assuring that complainants are always presumed to be truthful. For example, one training slide advised "[t]he way someone reacts to an event should not determine whether or not we believe that the event happened (prime example: sexual assault)."

41. ECU Title IX training also relies on faulty statistics to concretize the idea that all complainants should be believed. For example, at one training a slide was presented that said "**Believe** the student no matter what." Kat Bursky, an ECU Victim Rights Advocate, advised trainees in relation to this directive that only 2%-4% of sexual assault allegations are false reports. This statistic—lifted from the feminist work of Susan Brownmiller as opposed to empirical research—was not only misquoted but its validity has frequently been questioned. Bursky further advised trainees to assure the alleged assault victim that it is not their fault.

42. ECU also offers training programs to its Student Conduct Board members that are given by the AEquitas: The Prosecutors' Resource on Violence Against Women. Per AEquitas' website it "is able to provide prosecutors with the support, training, mentorship, and resources necessary to objectively evaluate and constantly reexamine and refine their approach to justice in gender-based violence and human trafficking cases." ECU offers an AEquitas program to Student Conduct Board members titled "*Who needs force when you have alcohol?*" A description of the training is on AEquitas's website:

> This presentation, delivered in two parts, explored common issues and challenges related to the investigation and prosecution of sexual assault cases where alcohol is present. More specifically, the presenters focused on identifying corroborating evidence, interviewing victims, basic toxicology, the [e]ffect of societal attitudes about alcohol on determinations of victim credibility, and trial strategies. In addition, these recordings promote a victim-

11

centered response that incorporates offender-focused strategies for effective investigation and prosecution of AFSA cases.

Thus, ECU provides training for its Student Conduct Boards that is grounded in the prosecution of criminal cases, with a focus on violence against *women*. The prosecutorial process takes an adversarial approach to men accused of sexual assault, while colleges and universities, which apply the lesser preponderance of the evidence standard, are supposed to provide a fair and impartial inquisitorial approach.

43.     ECU also provides Title IX training led by the Association of Title IX Administrators ("ATIXA") to Student Conduct Board members and, upon information belief, ECU's Title IX investigators. ATIXA has been known to use gendered language in its training courses, portraying men as sexual aggressors and referring to respondents in sexual misconduct cases as male. ATIXA trainings have also advised Title IX administrators to prohibit hearing panel members from questioning complainants about the details of the alleged sexual misconduct so as not to traumatize them.

44.     Upon information and belief, ATIXA training programs provided to ECU administrators, including Student Conduct Board members, included biased assumptions that males are responsible for obtaining consent and are typically the respondents in sexual misconduct cases, while complainants are typically females who always tell the truth and are traumatized.

45.     One ATIXA training offered to ECU Student Conduct Board members, *Blackouts and Consent*, includes a slide which defines "Consent" and features a photograph of a female student, carrying her books, with a smile on her face, suggesting that females give, and males ask for, consent.

46.     On March 8-9, 2018, ECU hosted an ATIXA training for Student Conduct Board members that advised how panels can protect themselves from being "attacked" in lawsuits

brought by students dissatisfied with the outcomes of their sexual misconduct cases, in effect teaching board members to take an adversarial position in proceedings that are supposed to be impartial.

47.     Upon information and belief, ECU's training programs foster a gender-biased approach to investigating and adjudicating sexual misconduct cases which begins with the presumption that males accused of sexual misconduct are guilty of the alleged misconduct.

### III.     ECU's Campus Climate: ECU Takes Measures to Protect Female Complainants In Response to Student Outcry

48.     As one of the largest universities in the University of North Carolina system, ECU is regularly a focus of media scrutiny, particularly with respect to the manner in which it handles campus sexual assault. The propriety of ECU's handling of sexual assault on campus has long been criticized by its female students and the student newspaper, *The East Carolinian*. This was particularly so in the months prior to the investigation into the false sexual misconduct allegations against John Doe.

49.     In January 2015, ECU was in the local press when a sexual assault was alleged to have occurred at an ECU fraternity house, causing the social activities of campus fraternities to be temporarily suspended.

50.     Although police eventually concluded that no sexual assault occurred, on February 4, 2015, ECU issued a press release stating that it was "taking on" sexual violence (the "February 2015 Press Release"). The February 2015 Press Release referenced the 2011 Dear Colleague Letter and noted that "[i]n May 2014, the OCR announced it was investigating 55 colleges and universities…and their handling of sexual abuse complaints."[3] It assured readers that ECU Police

---

[3] As discussed *supra* ¶¶ 30-38, ECU was under OCR investigation at this time.

and the Division of Student Affairs would continue raising awareness through events such as "Take Back the Night" and "Walk A Mile In Her Shoes[4]"

51.     Quoted in the February 2015 Press Release was Defendant Hardy, ECU's Vice Chancellor for Student Affairs:

> We need to hit it head on…several studies indicate that a substantial proportion of *female* students—between 18 and 20 percent—experience rape or some other form of sexual assault during their college years. At ECU, from 2010 to 2012, reports of forcible sex offenses on campus climbed from four to 11. Whether that indicates an increase in the crime or an increase in reporting isn't clear. (emphasis added).

52.     Also quoted in the February 2015 Press Release was "sexual violence expert," and ECU professor Heather Littleton, who stated:

> A lot of *women* who have been sexually assaulted don't feel comfortable seeking in-person therapy…. Over half of them don't consider what happened to them to be rape or even a crime. (emphasis added)

53.     Per the February 2015 Press Release, "ECU has worked during the last few years to encourage reporting through educational programs, outreach and improving the reporting process." LaKesha Alston Forbes, Associate Provost for Equity and Diversity and Title IX Coordinator, "agree[d] that it might seem odd that an administrator would get involved in what would seem like a police matter, but she says police are limited in their jurisdiction to provide 'interim measures' to maintain a safe and equitable campus environment." Forbes added "Title IX has really called for increased prevention and response efforts for the campus as well as enhancing critical partnerships with campus and local police departments." The February 2015 Press Release concluded with a quote from Bill Koch, Associate Vice Chancellor, that "we need to reduce our risk if we can. There are predators out there, and they are looking for easy targets."

---

[4] This event requires men to walk a mile in women's high heels. Per the official website of "Walk A Mile In Her Shoes" it is a playful opportunity for men to raise awareness in their community about the serious causes, effects and remediations to *men's sexualized violence against women*." (emphasis added). http://www.walkamileinhershoes.org/

14

54. On February 6, 2015 ECU announced that it was reviewing its fraternity guidelines and created a website called "ECU Cares"[5] which included information and resources that inform people on how they can file a report and how to safely intervene if they witness a sexual assault.

55. In mid-April 2015, ECU announced that it had joined the "It's On Us" campaign[6] and launched a week of awareness that included a panel which involved a female ECU student who was a survivor of sexual assault. The panel also included Dean of Students and Defendant Roeder. In an *East Carolinian* article, a representative for the SGA was quoted as saying "we can't fix the world's injustices all in a week…. As we continue into the next year, this campaign will be the building block on our relationships with the administration, the community and even the state when we talk about sexual assault in Pirate Nation."

56. In late April 2015, the *East Carolinian* published an article captioned "If 'It's On Us, what's on ECU?," which heavily criticized ECU for failing to protect complainants in sexual misconduct cases, causing complainants additional trauma and failing to "treat[] complainants in a just manner." As outlined in the article ECU administrators: (i) frequently asked complainants about what they were wearing on the nights of the alleged assaults; (ii) failed to ask complainants how they were coping with the incidents; (iii) took too long to conclude investigations; (iv) callously notified complainants about case outcomes by email; (v) dismissed the majority of sexual assault complainants; (vi) failed to impose adequate interim measures to avoid further complainant traumatization; (vii) failed to pursue investigations in cases where criminal charges were dropped; and (viii) covered up sexual assault complaints to protect ECU's reputation.

---

[5] The current version of the ECU Cares website contains a link to "Victim Services." The Victim Services page, predominantly portrays men as sexual aggressors. 3 out of 4 hand drawn cartoon images on the page show a male and female in various situations in which the women confirm that "Just Because…Doesn't Mean I Owe You." http://www.ecu.edu/cs-studentaffairs/victimservices/

[6] Notably, the national It's On Us website prominently features statistics about female sexual assault victims, including "female students are 4X as likely to be victims of sexual assault than males." Also included on the website are videos portraying men as rapists. http://www.itsonus.org/

57. The article quoted Defendant Hardy as stating "[Sexual assault] is an ever moving target…we're always tweaking things from what's being told from us from the federal government or whomever, but also feedback." Defendant Roeder, Dean of Students, said she wants students "to feel that their case is taken seriously and that we did everything and we support them in anyway we can…[w]e don't know if they don't come to us. I really want them to feel okay to come."

58. On April 28, 2015 ECU responded to the criticism through Hardy who posted an article in the *East Carolinian*. In the article Hardy made the following statements:

(i)  "Sexual assaults are high profile concerns on college campuses around the state and nation…the university is not sitting quietly."

(ii)  The 2011 "Dear Colleague Letter" and the "Not Alone" report from the White House in 2014, shifted Title IX "significantly to focus on sexual assault, sexual violence and sexual misconduct. These guiding principles *forced*…colleges and universities to evaluate existing reporting processes associated with Title IX." (emphasis added).

59. On September 22, 2015, the local news, CBS North Carolina, published a story about how ECU did not adequately investigate a female student's rape claim. The report noted: "Prior to [2015] ECU had one person overseeing Title IX, which sexual assaults fall under. After students voiced concerns, the university decided to train everyone in the Office of Student Rights and Responsibilities to handle the cases, bringing the number from one to seven."

60. On November 9, 2015, ECU kicked off Purple Pledge Week "a weeklong initiative, focused on education and advocacy centered on the issues of sexual violence, harassment and bullying." This was part of a "national initiative" that occurs on college campuses. Activities featured a "Take Back the Night" walk, a video from the "It's On Us" campaign, purple wristbands and a Clothesline Project.[7] ECU's faculty were also invited to play an It's On Us video as students

---

[7] The Clothesline Project is a national project founded in 1990 that was meant to attention to the "real meaning of violence statistics that are often ignored" about how many women "were killed by the men who claimed to love them." http://clotheslineproject.info/index.php

filed into classrooms during that week, regardless of the subject matter of their classes. ECU's Associate Director for Student Involvement and Leadership, Erik Kneubuehl, noted "This is a branded *mission* to change the culture of ECU's campus around the idea that sexual violence…has to end." (emphasis added).

61.     On November 12, 2015, in an article in *The East Carolinian*, Kathleen Bursky, ECU's "Victim Advocate," noted that "[v]ictims find it empowering that ECU is *behind them and know what they are going through*." (emphasis added).

62.     On November 19, 2015 ECU's Chancellor's Committee on the Status of Women hosted a screening of "The Hunting Ground" on campus. The screening was followed by a panel discussion and experts and counselors were on hand so that "all" issues that arose would be "handled with great sensitivity."

63.     The Chancellor's Committee on the Status of Women is an ECU Committee that advises the Chancellor, Provost and other university leaders on the planning, implementation and evaluation of policies and practices that *promote equity and further the welfare of all women* associated with ECU. http://www.ecu.edu/cs-acad/ccsw/about-us.cfm. Defendant Hardy, Vice Chancellor for Student Affairs, LaKesha Alston Forbes, ECU's Title IX Coordinator, and Malorie Porter, Title IX Compliance Officer, are ex officio members of this Committee. *Id.* "Advocacy" work done by the Committee includes having an "active role" in preventing sexual assault at ECU including working on ECU's 2015 "Title IX campaign."

64.     As set forth below, ECU was notified of sexual misconduct allegations against John Doe, within days of the conclusion of Pledge Purple, and within 48 hours of the campus screening of the *Hunting Ground*. Upon information and belief, the campus pressures faced by ECU

17

administrators to protect female victims caused them to investigate and adjudicate the allegations against John Doe in a manner that discriminated against him because he is male.

65.     Public statements made by ECU administrators from February 2015-November 2015, as well as the sexual assault advocacy events that took place on campus, indicate that ECU's administrators were facing extreme pressure to implement Title IX procedures that were more favorable and more sympathetic to *female* sexual assault victims and that would encourage reporting.

66.     ECU's Title IX personnel engaged in activities in which they advocated for female victims of sexual assault, as part of a campus wide campaign. This was, at a minimum, a conflict of interest and indicative of bias in favor of female victims of sexual assault. Upon information and belief, ECU's Title IX personnel were unable to execute ECU's sexual misconduct policies and procedures, including the investigation of complaints, in a fair and impartial manner due to their bias in favor of female victims and mission to stand behind those victims in the face of federal, local and campus pressure.

67.     ECU's administrators operated under the assumption that females were typically victims of sexual assault and males the sexual aggressors. Upon information and belief, ECU's female friendly Title IX campaign, which began in January 2015, caused ECU to take a more aggressive stance towards men accused of sexual misconduct and led to more men being found responsible for violations of ECU's sexual misconduct policy. Upon information and belief, since January 1, 2015, no females have been accused of sexual misconduct at ECU. Upon information and belief, all males accused of sexual assault since 2015 have been sanctioned.

**IV.     The Allegations Against John Doe**

68.     John Doe is a lifelong resident of North Carolina, regularly attends the same local church with his extended family and is an Eagle Scout. He is also a member of Mensa.

69.     In November 2015, John Doe was enrolled in the Masters of Criminal Justice program at ECU, which is taught online. John Doe did not attend classes on ECU's campus for this program. He anticipated obtaining his Master's Degree in December 2016. After that, John Doe intended to enter Officer Candidacy School for the United States Marine Corp. and was actively discussing the same with a Marines Corp. representative. John Doe's future goal was to become an attorney, and he scored well on the LSAT.

70.     Prior to enrolling in ECU's online graduate program, John Doe attended ECU as an undergraduate student, obtaining his Bachelor's degree in May 2015.

71.     John Doe was friends with M.K., an ECU undergraduate, through a service fraternity to which they both belonged. They met when John Doe was an ECU undergraduate. After he graduated, John Doe and M.K. stayed in touch. M.K. invited John Doe to attend a party she was having at her off-campus apartment on the night of November 20, 2015. He agreed and attended the party with two of his friends. The party, disguised as a birthday party for M.K., was actually a celebration of the new fraternity members who had obtained full membership status earlier in the evening, following a semester-long pledging process.

72.     At the party John Doe met Jane Roe for the first time. Jane Roe, an ECU undergraduate student, was his friend M.K.'s roommate. During the party Jane Roe was flirting with John Doe and they danced together with a group of people. Before leaving the party in the early morning hours of November 21, 2015, John Doe looked for Jane Roe to say goodbye. When he was saying goodbye, the two started kissing and made their way into a small bathroom. Jane

19

Case 4:18-cv-00137-BO   Document 1   Filed 08/09/18   Page 19 of 69

Roe removed her clothes and helped John Doe remove most of his. She performed oral sex on him and then they engaged in vaginal intercourse in two different positions. They did not use a condom. During intercourse, Jane Roe instructed John Doe that it was permissible to ejaculate in her vagina because she had subdermal birth control embedded in her left arm. John Doe was confused by this offer as he was unfamiliar with this type of birth control. He withdrew and subsequently ejaculated.

73.     During the interaction, someone knocked on the door twice, with a short break between the first and second knock. Jane Roe instructed John Doe to yell "F*%k Off" to the person on the other side of the door following the second knock. John Doe yelled "F*%k Off" so they could continue their interaction. When the two were finished, Jane Roe leaned in to kiss John Doe on the lips. He turned his head and the kiss was instead planted on his neck. Jane Roe asked John Doe "Who should leave first?" John Doe responded "I don't care" so Jane Roe left first and John Doe followed shortly after. Shortly after, John Doe took an Uber car home with his friend, S.K.

74.     On the morning of November 21, 2015, shortly after leaving the party, John Doe's friend M.K. called him and told him that Jane Roe had accused him of rape. John Doe denied all accusations as the encounter was consensual. M.K. and John Doe mutually agreed to talk later that morning. She asked him to call her at 10:00 a.m. John Doe attempted to contact M.K. several times at 10:00 am and through the next 30 minutes. M.K. never answered her phone. Instead, another attendee at the party, J.P. sent John Doe a message via Facebook calling him a "monster for what John Doe had done to his best friend." John Doe was shocked as every aspect of his interaction with Jane Roe was consensual, as evidenced by, among other things, her unsolicited exclamation about birth control.

75.     John Doe called his mother to inform her of the early morning event. At her request, John Doe immediately made the 22-mile trip home while she called a local attorney for advice.

20

On the evening of November 21, 2015, the attorney came to John Doe's residence to discuss the allegations. Specifically, the attorney learned that Jane Roe had made a report to police, accusing John Doe of rape and that a detective, Coggins, had tried to locate John Doe at his place of employment. The detective phoned John Doe's cellphone and left a message for John Doe to contact him. Because of the rural nature of John Doe's residence, cellular reception is spotty and inconsistent hence the reason for the missed call.

76.     As John Doe was listening to the voice message, Detective Coggins phoned a second time. Caller ID indicated the incoming call was from the investigating officer. Therefore, John Doe's attorney answered the phone and talked to Detective Coggins. The call was dropped due to poor reception. While attempting to make contact with Coggins via a land line phone, Coggins called on the land line phone and talked to John Doe's attorney. He informed Coggins that John Doe would be available for questioning only in the presence of his attorney. Given the late hour and that Thanksgiving was four days away, it was mutually agreed upon that Detective Coggins would question John Doe at his attorney's office the following week. Detective Coggins was to schedule the meeting. Detective Coggins was never heard from again. No meeting ever occurred with John Doe despite the agreement and willingness of John Doe to talk with Coggins in the presence of his attorney.

77.     On December 9, 2015 John Doe was arrested. John Doe was charged with sexual assault but these charges were not prosecuted due to insufficient evidence, including, upon information and belief, evidence that Jane Roe had recently engaged in another sexual encounter as supported by evidence of a third person's DNA discovered via the processing of the rape kit by the North Carolina State Crime Lab.

## V. The Myriad ECU Policies and Procedures Related to Sexual Misconduct: Agreements, Representations, Covenants and Warranties Between Plaintiff and ECU

78.     In November 2015, a veritable maze of policies and procedures were in place at ECU: (i) "Student Conduct Process: Interim, effective as of 1/1/15;" (the "Student Conduct Code") (ii) "Interim Regulation on Responding to Complaints of Sexual Harassment, Sexual Misconduct and/or Discrimination on the Basis of Sex," effective as of 11/25/14 (the "Interim Sexual Misconduct Regulation") and (iii) "Regulation Addressing Sexual Assault, Domestic and Dating Violence as required by the Violence Against Women Act Amendments to the Clery Act: Interim," effective as of 8/18/15 (the "Interim VAWA Regulation").

79.     Because ECU is a constituent university of the University of North Carolina ("UNC") system, it was also governed by UNC policies and procedures, including but not limited to the "Policy on Minimum Substantive and Procedural Standards for Student Disciplinary Proceedings" (§ 700.4.1 of the UNC Policy Manual).

80.     UNC's "Policy on Minimum Substantive and Procedural Standards for Student Disciplinary Proceedings" (§ 700.4.1 of the UNC Policy Manual) require:

(i)     Notice and an opportunity for a hearing. § II.

(ii)     That the decision reached be neither arbitrary nor capricious, there is "some evidence to support the decision reached." § III.

(iii)     For violations of student conduct codes that could result in suspension or expulsion, the provision of a written notice that "specifies the offense(s) charged" and contains a "brief recitation of the factual allegations supporting the charge." § VI.A.2.

(iv)     In cases that go to a hearing, "the student must be given the opportunity to review any written evidence that will be used at the hearing and to obtain a list of witnesses." § VI.A.6.

(v)     "The institutions shall ensure that students have the capability to present their evidence and defenses at the hearing." § VI.A.8.

(vi) "At the hearing, a designated university official must present sufficient witness and/or documentary evidence to establish the violation. The student *must* be given an opportunity to question this evidence, either by indirect questions or inquiries transmitted through the committee or hearing official." § VI.A.11.

(vii) "At least one level of institutional appeal must be permitted…Further appeals shall be governed by the Code of the University of North Carolina." §§ VI.A.17-18. UNC Code Section 502 D (3) states in part "in discharge of the chancellor's duty with respect to matters of student discipline, it shall be the duty of the chancellor to secure to every student the right to due process. Appeals from these disciplinary decisions are allowable only on the following grounds:….Where the sanction is suspension an appeal may be made to the board of trustees."

(viii) "If the formal charge is also the subject of pending criminal charges, the institution must, *at a minimum*, allow an attorney advisor to accompany the student to the hearing." § VII.A (emphasis supplied).

(ix) In cases of alleged sexual misconduct, *both* parties are entitled to the same opportunities to have others present during a disciplinary proceeding. § VII.C.

81. The Student Conduct Code incorporates the UNC "Policy on Minimum Substantive and Procedural Standards for Student Disciplinary Proceedings" by reference and provides in relevant part:

(i) The Board of Governors and the President of the University of North Carolina have delegated the responsibility to manage student conduct to the Chancellor of each constituent campus." § 1.1. From November 2015 to June 30, 2016, Steve Ballard was the Chancellor of ECU. From July 1, 2016 to the present, Cecil Staton has served as ECU's Chancellor.

(ii) "ECU's Chancellor, in turn, charged the Vice Chancellor for Student Affairs with overseeing the student conduct process. The Office for Student Rights and Responsibilities and the Student Conduct Board have been created to assist this effort." § 1.1. Defendant Hardy served as the Vice Chancellor of Student Affairs during the relevant time period.

(iii) "students have the right to be treated with respect and consideration, have freedom of inquiry, and have reasonable use of services and facilities." § 1.3.

(iv) "[u]pon acceptance of admission to ECU, each student agrees to abide by the policies of the University and to conduct her/himself on- and off-campus in a manner consistent with its educational mission." § 1.3.1.

(v) "[v]iolations of the Student Code of Conduct, will result in educational and/or disciplinary sanctions. Sanctions are designed with the intent of educating Respondents and protecting the ECU community. No sanctions will be enforced until all reviews have been exhausted." § 3.

(vi) OSRR may take "Immediate Administrative Action" in order to "preserve the safety and well-being of the ECU community and its members." §3.1. "These actions include, but are not limited to…no-contact ban or removal from classes, and administrative suspension." *Id.*

(vii) Administrative suspension is "the immediate separation of the student from enrollment at the University…becomes effective immediately whenever there is information that the continued presence of the student on University property poses a substantial threat. A substantial threat might include, but is not limited to, [or] threatening the safety of any person, significantly harming or attempting to harm someone." § 3.1.2.

(viii) "Both Complainants and Respondents in cases specific to sexual misconduct, will be provided information about available on and off campus resources, including but not limited to: victim advocacy, counseling/mental health services, disability support services, health services, and explanation and assistance regarding reporting a crime to campus or local law enforcement." § 3.1.1.

(ix) "[w]hen determining sanctions, conduct administrators and members of the Student Conduct Board take into account, the nature and seriousness of the violation, the impact of the violation on the community, the Respondent's past conduct history, as well as the Respondent's developmental needs, and mitigating or aggravating factors existing at the time of the offense, which may include but are not limited to: past disciplinary record, the nature of the misconduct …as well as other relevant information regarding the degree of any damage, injury, or harm resulting from it." § 3.2.

(x) "Respondent Rights" including (a) the right to an "objective and impartial evaluation of the complaint;" (b) the right to "reasonable access to all information gathered throughout the evaluation pertinent to the alleged violation;" (c) the right to present information "relevant to the alleged violation;" and (d) the right to respond to information presented against him. § 4.1

(xi) Complainants have the right to submit written impact statements to the Student Conduct Board. Respondents do not. §§ 4.1, 4.2.

(xii) Complainants have the right to be "free of *irrelevant* questions about sexual history." § 4.2.1.6. Respondents do not have this right. § 4.1.1.

(xiii) "The ECU conduct process functions independent of the criminal justice system." § 5.1.2.

(xiv)    The standard used throughout the conduct process to reach case resolution is "preponderance of the evidence." "This standard will be used to evaluate the evidence for purposes of making findings and drawing conclusions for an investigation conducted under this regulation; meeting the standard constitutes a conclusion it is more likely than not that the alleged conduct occurred." § 5.1.3.

(xv)    Respondents are permitted to have licensed attorneys at Student Conduct Hearings. If they choose to bring an attorney they are *not* permitted to have a non-participating support person present. § 5.1.4. This rule does not apply to complainants. However, in less serious cases before a Conduct Administrator, respondents are permitted to have an attorney and a support person present. *Id.*

(xvi)    After a complaint of sexual misconduct is alleged, and before the Respondent is notified of the allegations or charges against him, OSRR holds a "gathering of information meeting" with the Respondent. § 5.2.3.

(xvii)    After the meeting, "[i]f a student is to be formally charged with a potential violation of the Student Code of Conduct, the student will receive a written notification …which will include written notice of the allegation, with a brief summary, as well as possible sanctions." § 5.2.5. A "follow up meeting" with Respondent will also be scheduled. *Id.*

(xviii)    "If the alleged violation might result in suspension or expulsion, the matter will be referred to the conduct board and will take place no earlier than *ten calendar days* after the meeting notice is sent to the student via letter or e-mail." §§ 5.2.5.2; 5.4.1 (emphasis added).

(xix)    In cases which require a hearing, the OSRR will notify the student in writing of "the charge, a brief summary of the allegation, possible sanctions, and the hearing date and time." § 5.4.1.

(xx)    In cases of alleged sexual misconduct, the hearing panel is composed of two faculty members and three staff members. One member is a non-voting Chair, who facilitates the panel's discussion and is responsible for writing "a rationale for the panel's decision." § 5.4.3.

(xxi)    The outlined hearing process does not include the respondent's right to ask questions of the complainant and/or witnesses, whether in writing or through the hearing panel. § 5.4.4.

(xxii)    The hearing panel is "to review all available, relevant information, and based on a preponderance of the evidence standard, make a determination as to whether or not a violation of the Code has occurred." § 5.4.4. If the hearing panel finds a student responsible at the hearing, then it will determine sanctions on the same day. "The decision will also be shared with the Respondent in writing within ten calendar days

of the date the decision was made. The letter will include a brief summary of the information upon which the decision was based and, will outline Respondent's appeal rights." § 5.4.4.4.

(xxiii)  Respondents have only 5 calendar days from the date that the written decision is received to submit an appeal to the OSRR. § 5.5.4.

(xxiv)  In cases where suspension or expulsion is the sanction, the final decision on appeal must be made within 45 calendar days after the hearing. The Respondent must receive written notice of the decision within 10 calendar days of the decision, including a brief summary of the information upon which the decision was based. § 5.5.8.

(xxv)  Only students who are expelled have a second right of appeal, to the East Carolina University Board of Trustees even though the ramifications of a suspension versus an expulsion are the same. §§ 5.6, 6.2, 6.4

(xxvi)  ECU maintains conduct records of students who are suspended or expelled indefinitely. § 6.2. Information about students who are suspended, expelled or "have serious pending cases" is entered into a University of North Carolina ("UNC") database where it is stored permanently. All UNC constituent institutions have access to the database.

(xxvii)  ECU places a permanent mark on the transcripts of students who have been suspended or expelled. § 6.4.

81.  The Interim VAWA Regulation, which was in effect at the time of Jane Roe's university complaint against John Doe:

(i)  referred to complainants as "victims" and respondents as "respondents;"

(ii)  adopted the student conduct process set forth in the Student Conduct Code, as set forth in Paragraph 60. §6.8.1;

(iii)  applied the "preponderance of the evidence" standard in sexual misconduct cases against students but required "clear and convincing evidence" in cases alleged against ECU faculty—including in cases alleging sexual assault. §§ 6.9.1, 6.9.2.

(iv)  stated "[t]he University endeavors, in and through each of the listed disciplinary proceedings it conducts, to provide a prompt, fair and impartial process and to complete the process of investigation and determination of responsibility within a reasonable time frame, *typically sixty days*. This timeline may be extended by the University with notice to the parties." § 6.6.1 (emphasis supplied).

82.     The Interim Sexual Misconduct Regulation states the following "Investigation Principles:"

> (i)     basing findings on the preponderance of the evidence standard (§ 4.2.1);
>
> (ii)    treating all parties fairly and equally (§4.2.2);
>
> (iii)   notifying all parties that the investigation will be impartial prompt and thorough (§4.2.4)

83.     The Interim Sexual Misconduct Regulation provides that "the University will make every effort to complete investigations within approximately 60 calendar days, depending on the complexity of the investigation and severity and extent of the alleged conduct." § 4.7.

84.     The Interim Sexual Misconduct Regulation permits ECU to keep complaints confidential—including by keeping information from the respondent—and to notify the complainant that an investigation is proceeding before the respondent is contacted. §§ 5.3.1. 5.3.2.

85.     The Interim Sexual Misconduct Regulation provides that "[i]nformation will be provided to *both* parties with respect to filing criminal charges." § 6.4.1(emphasis added).

86.     During the course of the 6-month investigation and adjudication of Jane Roe's university complaint against John Doe, described *infra*, ECU revised its Student Conduct Code and replaced the Interim Sexual Misconduct Regulation and Interim VAWA Regulation with the Regulation on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence. Because ECU failed to specify the exact regulations and code provisions it was proceeding under in John Doe's case—including in his sanction letter—it was unclear to John Doe whether ECU applied the regulations and Student Conduct Code in effect as of November 2015 or applied those subsequently issued.

## VI. ECU's Flawed and Biased Process: The Six-Month Investigation and Adjudication Period

### A. ECU Issues Baseless Interim Measures Against John Doe Under A Presumption of Guilt and Without Providing Notice of the Specific Allegations

87.     On November 24, 2015, Kristan Tucker ("Tucker"), a Title IX investigator, emailed John Doe a no contact order directing him to have no contact with Jane Roe or their mutual friend M.K. At the time, John Doe was taking graduate classes online, whereas Jane Roe and M.K. were undergraduates. They shared no classes together nor had occasion to come into contact with one another on campus.

88.     On the same day, Tucker sent John Doe a second letter informing him that OSRR "received a report involving possible conduct related to Title IX." It further stated "The report alleges a possible Title IX violation, in which you were named as a Respondent." The letter did not specify the complainant, date, time or location of the alleged violation. The letter did not specify the provisions of the ECU policies which were at issue as a result of the allegations. The letter did require John Doe to attend an "information gathering meeting" so that he could "provide [his] perspective of the incident" even though he was provided with no information about said "incident." Finally, the letter informed John Doe that a hold "*may have* been placed" on his registration records.

89.     On December 2, 2015 John Doe and his attorney met with Tucker. Tucker asked him to give his account of the "incident" with Jane Roe but failed to provide John Doe with any details of the specific allegations against him. John Doe's attorney informed Tucker that he could not respond to allegations if they were not specified. In response, Tucker indicated that she was aware of the criminal investigation into Jane Roe's allegations. She further informed John Doe that a "witness," John Doe's friend M.K., told Tucker that John Doe had acknowledged having

sex with Jane Roe—there was no statement at that time from M.K. that he admitted to rape. As discussed *infra* Paragraph 158, M.K. later changed her story. Tucker could not provide John Doe with any further allegations. Tucker stated that she would schedule another meeting with John Doe after conferring with University Counsel on how to proceed.

90.    On December 9, 2015, John Doe was arrested. *See supra* ¶ 77.

91.    On the same day, Tucker sent John Doe a letter informing him that ECU would investigate the allegations against John Doe. This letter, again, failed to detail the allegations or the ECU code provisions applicable to those allegations, leaving John Doe in the dark about the potential violations that he faced. Attached to the letter were forms signed by John Doe as well as copies of ECU's Violence Against Women Act/Title IX brochure; a list of resources geared towards victims of sexual assault. Notably, one form signed by John Doe indicated that Tucker *did not* discuss with him whether he wanted a no contact order against Jane Roe or assistance with filing a criminal complaint against her. John Doe was also required to sign a form acknowledging Respondent's rights and responsibilities as set forth in the Student Conduct Code.

92.    ECU then obstructed John Doe's access to his education file. Tucker's letter to John Doe further notified him that—even though he was now a respondent in an ECU investigation—ECU was not required to give him immediate access to his education files under FERPA and "[d]ue to current scheduling and the approaching university winter break schedule" ECU could not arrange for access until the week of January 4-8, 2016.

93.    Upon information and belief, Tucker did not have the requisite training or experience to adequately, fairly and impartially conduct Title IX investigations. Tucker, an attorney by training, also, upon information and belief, held an adversarial and biased approach towards male respondents accused of sexual misconduct. To the extent that Tucker received

29

training on Title IX investigations, upon information and belief, said training adopted a trauma-informed approach and fostered gender-biased views against males as sexual aggressors.

94.    On December 10, 2015, Defendant Tamika Wordlow ("Wordlow"), Director of the OSRR, emailed a letter to John Doe which, again, failed to detail Jane Roe's allegations against John Doe and listed all ECU policies applicable to sexual misconduct without specifying the code provisions that potentially applied to John Doe's case. He was merely informed that he could meet with administrators to discuss the allegations "when circumstances permit."

95.    Wordlow's December 10, 2015 letter further notified John Doe that due to the pending criminal charges against him, OSRR implemented an immediate administrative suspension, restricting access to all property owned and operated by ECU. OSRR also cancelled John Doe's Fall 2015 course registration, even though he was an online student and despite the fact that his finals were substantially completed. ECU also cancelled John Doe's Spring 2016 course registration, evidencing a presumption that he would be found responsible for the misconduct alleged.

96.    On December 10, 2015, while John Doe was in holding at the local county jail, ECU administrators from OSRR gained access to John Doe by sending an ECU police officer to the jail and causing John Doe to sign documents under duress. While in custody, and during a period of extreme emotional distress, John Doe signed a document acknowledging receipt of Wordlow's December 10, 2015 letter and was given a trespass warning banning him from all ECU properties.

97.    On or about December 10, 2015, ECU violated John Doe's right to privacy and confidentiality under FERPA, and its own policies, by discussing John Doe's academic history with a local newspaper reporter and two local news channels, including that John Doe was no

longer enrolled at ECU. Because ECU had blocked John Doe's access to his education records, this is the manner in which he learned that he had been removed from ECU enrollment.

98.     John Doe appealed the administrative suspension and cancellation of his course registration. On December 17, 2015, John Doe was notified that his appeal was denied. His appeal was reviewed by Dean of Students, Defendant Roeder, who "after thoroughly reviewing your case file has determined that you present a significant safety risk to the ECU Community and has denied your appeal." Not only had John Doe been denied access to the "case file" that was the basis for Roeder's decision, the only evidence that could have been in the case file were Jane Roe's allegations, as John Doe—now subject to criminal charges—had not been able to present his side of the story.

99.     In implementing the administrative suspension, ECU determined that John Doe—a student in good standing who had no history of disciplinary issue—was guilty simply because Jane Roe filed a criminal complaint against him. Based on this presumption of guilt, and without evidence, ECU destroyed an entire semester of John Doe's graduate work. ECU further harmed John Doe by banning him from "all property owned and operated by ECU" because this denied him access to medical services. John Doe's physician was located on ECU's health sciences campus as he is a physician employed by ECU within the Brody School of Medicine. The health sciences campus is approximately four miles from the main campus.

100.    Shortly after the suspension was implemented, John Doe fell ill and suffered severe emotional distress, including suicidal ideation. He was terrified to visit his physician to obtain a referral or other services due to the fact that ECU banned him from its property. No one had advised John Doe that the ban could be lifted for medical, or other reasons, or provided him with

instructions on how to get the ban lifted in order to see his medical provider. This resulted in additional emotional distress and delay in receiving care in an outpatient setting.

101. On December 15, 2015, John Doe met with his physician at a local Starbucks rather than within the normal medical setting. As a result of their conversation, John Doe's physician prescribed medication to John Doe. Because the prescription was embossed with the ECU seal, and prescribed by an ECU physician, John Doe did not fill the prescription out of fear of reprisal from ECU under a presumed violation of the No Trespass order.

102. On December 22, 2015, John Doe suffered an extreme panic attack following night terrors and continued suicidal ideation. John Doe reached out to a local physician known to his family who assessed his mental state and provided emergency medication. Jon Doe secured an appointment with a new medical provided in or around December 28, 2015.

### B. Wordlow Assigns Inexperienced and Biased OSRR Employee to Investigate John Doe's Case After Notifying John Doe About Her Excitement That the Prior Investigator Left and Is Fulfilling Her Career Aspirations

103. On January 5, 2016, John Doe received an outrageous letter from OSRR Director, Tamika Wordlow, informing him that there would be a change in the Title IX investigator assigned to his case:

> Originally, Kristan Tucker was assigned to your case as the Title IX investigator. Ms. Tucker will no longer be affiliated with [ECU] beginning January 9, 2016. *The [OSRR] is excited for Ms. Tucker as she continues her career aspirations*. (emphasis supplied).

The letter suggested that Wordlow and ECU were more concerned about Tucker's career aspirations than John Doe's right to a timely, fair and impartial investigation. Wordlow further informed John Doe that Defendant Butler would be the new Title IX investigator on his case.

104. Upon information and belief, Butler, a recent ECU alumna who was less than two years out of graduate school, had no prior education, experience or training in conducting Title IX

32

investigations prior to being assigned to John Doe's case. At the time that she conducted the "investigation" Butler had not even officially been assigned the role of Title IX investigator within OSRR. Upon information and belief, Wordlow hastily assigned Butler to this role because of Tucker's departure, and because the OCR investigation was pressuring ECU to respond to Title IX complaints within a shorter timeframe.

105.     Upon information and belief, to the extent that Butler received any Title IX training in conducting Title IX investigations, said training adopted a trauma-informed approach and fostered gender-biased views against males, as set forth *supra* Paragraphs 38-46, which caused Butler to investigate the allegations against John Doe in a gender biased manner. Butler was the *sole* investigator responsible for determining whether a policy violation occurred in John Doe's case.

106.     Butler also had a conflict of interest as, upon information and belief, part of her role within OSRR required her to monitor ECU's policies and procedures to ensure the University's compliance with Title IX which impacted her ability to conduct an impartial investigation.

107.     On January 8, 2016, John Doe and his attorney were granted access to a heavily redacted file concerning Jane Roe's allegations. From what could be gleaned from the file, ECU had mostly irrelevant character evidence in the file. The full details of the allegations against John Doe could not be determined. It appeared that Jane Roe supplemented her allegations against John Doe after later remembering more information. There appeared to be little or no firsthand or verbatim witness accounts in the file.

108.     On January 14, 2016, Butler emailed a letter to John Doe stating "at this time, we are still interviewing witnesses and collecting information." The letter did not specify which witnesses were being interviewed or what information was being collected—information that

Butler, Wordlow and ECU refused to disclose to John Doe throughout the course of the purported investigation.

109. On January 20, 2016, Butler emailed a second letter to John Doe. The letter—a slightly revised form letter—quoted the Title IX statute, and then vaguely stated that ECU received a "report" alleging a "possible Title IX violation." The purpose of the letter was to arrange a meeting with John Doe—who was now under criminal investigation— on a date unilaterally set by Butler to give him "the opportunity to provide [his] perspective of the incident." Once again, the letter failed to detail the allegations against John Doe, or the specific code provisions that applied. Appended to the letter was a copy of ECU's revised sexual misconduct policy, the *Regulation on Sexual and Gender-Based Harassment and Other Forms of Interpersonal Violence*, effective as of January 1, 2016, which post-dated the allegations against John Doe. Overwhelmed with the volume of correspondence, John Doe missed that Butler had scheduled a meeting as opposed to sending him yet more copies of the ECU policies. They rescheduled the meeting.

110. On January 28, 2016, Butler emailed yet another letter to John Doe informing him that ECU would proceed, and make a decision, based on the information gathered even if he chose not to participate. While Butler took care to cite the code provisions relevant to ECU's right to proceed, the letter was—again—devoid of any information specifying the allegations against John Doe or the code provisions relevant to the allegations.

111. Attached to the January 28th letter was ECU's newly minted handout—which John Doe received for the first time and post-dated the allegations against him—"Resource and Reporting Guide For Students Accused of Incidents of Prohibited Conduct." In a section titled "Common Feelings After Being Accused of Sexual Violence" the document warned "[p]lease be careful to avoid unhealthy ways of coping with anger such as alcohol or drug use, cutting, or other

self-destructive behavior" yet the "resources" provided by ECU all centered around assisting victims of sexual assault—not the accused.

112. On January 29, 2016, Butler informed John Doe and his attorney that they could review his education file—a request that had been made on numerous occasions.

113. On February 3, 2016, John Doe and his attorney met with Mandy Messerli, Associate Director of the OSRR, to review his education file. Messerli prohibited John Doe from making copies. The information accessible to John Doe was so heavily redacted that he was unable to clearly discern what information had been gathered with respect to Jane Roe's allegations against him. An ECU attorney was also present at the review. Messerli remained in the room during the time in which John Doe and his attorney reviewed the file, which impeded his attorney's ability to take notes into a recorder. John Doe and his attorney were permitted only 2.5 hours of review time as Messerli had to leave to pick up her child.

114. Upon information and belief, Butler did not interview witnesses on her own, but instead relied on reports provided to her by local police as part of the criminal investigation, even though the criminal process is adversarial rather than inquisitorial in nature and, according to ECU's own Student Conduct Code, is not relevant to evaluating evidence under a preponderance of the evidence standard.

115. On February 5, 2016, due to the pending criminal matter, John Doe informed Butler that he would not be providing information to ECU about Jane Roe's allegations.

116. On February 6, 2016 Butler emailed a letter to John Doe which informed him that "the final investigative report is being drafted."

117. On February 18, 2016, Butler emailed a letter to John Doe stating:

The investigation is complete at this time. I was able to find, by a preponderance of evidence, a violation of the sexual misconduct policy and/or the Student Conduct

35

Code and am referring this to the Director of [OSRR] for review and appropriate follow-up.

The letter concluded, as if to reassure ECU administrators, that "[t]he University has thoroughly, carefully, and appropriately investigated the concerns brought forth." Yet no careful, thorough or appropriate investigation had occurred at all. Moreover, "thorough and appropriate" was not the standard set by the Student Conduct Code.

118.    Even though Butler found that John Doe violated ECU's policies, she provided no rationale for the finding. John Doe had still not been notified of the specific allegations against him or the specific code provisions that he had purportedly violated. Nor was John Doe provided with a copy of the final investigative report. Butler's letter referenced the Regulation on Sexual and Gender-Based Harassment but did not state whether the violations she purportedly found fell under that code—which was enacted *after* the occurrence of the alleged incident between John Doe and Jane Roe—or the policies in effect at the time of the alleged incident.

119.    On April 6, 2016, John Doe and his attorney were permitted to review a heavily redacted copy of the investigation file. They were not permitted to make copies of any materials and OSRR personnel were present, which chilled communication between John Doe and his attorney. Thus, John Doe was only permitted to see the evidence relied upon by Butler after she had already determined that he was responsible for violating ECU's policies. He was given no opportunity to correct or respond to the information provided. Moreover, ECU officials knew that he could not give his side of the story due to a pending criminal investigation. Even so, the evidence relied upon by Butler was insufficient to prove by a preponderance of the evidence that John Doe was responsible for violating any ECU codes, policies or procedures.

120.    John Doe's brief review of the heavily redacted copy of the investigative report, revealed that Butler relied on hearsay statements, and false statements about John Doe's character

36

and reputation—including false allegations concerning his prior sexual history—to wrongfully determine that John Doe was responsible for nonconsensual sexual contact with Jane Roe. Because John Doe was unable to provide a statement due to the pending criminal charges against him Butler simply accepted Jane Roe's account as truth.

121.    Per John Doe's familiarity with the evidence in the criminal case, which Butler appeared to rely upon, there were no corroborating witnesses as to what occurred between John Doe and Jane Roe in the upstairs bathroom at her apartment. While Jane Roe described a forceful and violent encounter, no one heard any noise or commotion, including a friend of Jane Roe's who reported knocking on the bathroom door and having a brief conversation with John Doe through the bathroom door. Butler further ignored evidence that contradicted the accounts of Jane Roe's friends with respect to John Doe's demeanor after the alleged incident with Jane Roe. Jane Roe's friends stated that he ran out of the party, while an acquaintance of John Doe's confirmed that John Doe was not in a rush, called an Uber and the two shared an uneventful car ride home together.

122.    The criminal file, which Butler appeared to review, disclosed that Jane Roe had been intimate with more than one man on the night she accused John Doe of sexual assault. Upon information and belief, Butler, who had little experience as an investigator, failed to question Jane Roe at all, instead relying on her statement to police and, if she did question Jane Roe, Butler failed to ask probative questions about the alleged incident, question discrepancies in her account, or question her about exculpatory evidence because Butler utilized a biased approach when conducting the investigation.

123.    Upon information and belief, Butler presumed that Jane Roe was a traumatized victim who had to be telling the truth and John Doe, as a male, could only be a forceful male aggressor as described. This led Butler to investigate the allegations of John Doe under a

presumption that he was guilty as accused, rather than looking at the evidence fairly and impartially as required under ECU's Student Conduct Code and sexual misconduct policies.

124.     John Doe had no right to appeal Butler's finding, or request a reopening of the investigation, before the finding was referred to OSRR.

### C.  Wordlow Refers John Doe's Case to the Student Conduct Board

125.     Three months after Jane Roe's university complaint was filed and *after* Butler found that he violated ECU policies, on February 22, 2016, Wordlow emailed a letter to John Doe notifying him of the allegations against him. However, the letter still failed to specify or define the code violations for which he was found responsible. The letter further notified John Doe that OSRR was referring the case to the ECU Student Conduct Board but provided no specific reason why it was being referred, generally stating "due to the nature of the reported incident and/or your disciplinary history OSRR is referring your case to the …Student Conduct Board." John Doe had no disciplinary history. The letter further stated "a hearing will be scheduled and announced to you in future correspondence."

126.     Wordlow sent two letters to John Doe, on March 4 and 15, 2016, notifying him that the case was still pending and a hearing would be scheduled. It was not until March 28, 2016— over one month after John Doe received notification that Butler found him responsible for unknown code violations—that John Doe was notified that the Student Conduct Board hearing would take place on April 15, 2016. At this point, John Doe had still not been granted full access to the unredacted investigation file or the final investigation report. At this point, he still did not have notice of provisions of the ECU conduct code that he purportedly violated.

127.     By letter dated March 28, 2016, in response to Wordlow's letter concerning the Student Conduct Board hearing, John Doe's attorney asked Wordlow to clarify what the "charges"

were against John Doe and to point out that Wordlow's description of the Student Conduct Board—as including students—was violative of Section 5.4.3 of the Student Conduct Process which required that students not be included on the panel in cases where sexual misconduct has been alleged. The letter further informed Wordlow that John Doe's participation in the process did not constitute a waiver of his right to a hearing or an acceptance of any sanctions imposed.

128.    On March 29, 2016, John Doe was assigned a student advisor who purportedly was "trained on the conduct process and [could] assist with organizing" John Doe's "description of the incident, concluding remarks and generating questions for witnesses." The student advisor assigned to John Doe, a male ECU undergraduate, told John Doe not to tell him anything about the case because he was, in effect, the University's "mole" and was required to report back everything discussed with John Doe to Tamika Wordlow. John Doe's student advisor later went on to publicly criticize ECU's student conduct process in cases of sexual misconduct as unfair to male respondents and violative of their due process rights.

129.    On April 4, 2016, Wordlow responded to John Doe's attorney, purportedly to inform him of the "charges" against John Doe. The first was "Endangerment" which included "engaging in non-consensual contact." The letter further stated that endangerment "can include, but is not limited to sexual misconduct as defined in the "University's 'Regulation on Responding to Complaints of Sexual Harassment, Sexual Misconduct and/or Discrimination on the Basis of Sex"—again, this Regulation was not in effect at the time of the alleged incident between John Doe and Jane Roe. The second "charge" was a vague "violation of university policies" which included "[v]iolations of campus or University policies, rules or regulations, or federal, state, or local law." The letter informed John Doe that he could access the investigative report and "appendix documents" at an on-campus meeting on April 6, 2016. Wordlow could not provide

John Doe with the names of the panel members that would participate at the hearing as they had not yet been selected.

130.    On April 9, 2016, Wordlow disclosed the names of the panel members to John Doe.

131.    On April 14, 2016, Wordlow emailed a letter to John Doe confirming the April 15, 2016 hearing date. The letter informed him that his student advisor—who had turned out to be an advocate for respondent rights—could not attend the hearing due to "personal matters." John Doe was shocked as he had spoken to his student advisor and he had confirmed that he would be at the hearing. Upon information and belief, Wordlow decided to remove John Doe's student advisor from his role because he spoke up for respondent's rights, including John Doe's, and would not comply with Wordlow's demands that he report back to her about his conversations with John Doe.

132.    John Doe did not wish to waive his right to have his student advisor present at the hearing and requested a short adjournment.

133.    OSRR rescheduled the hearing for April 22, 2016, a date that did not work for Jane Roe. The hearing was ultimately rescheduled to over a month later, on May 27, 2016.

134.    Only 5 days before the hearing, John Doe was assigned a new student advisor, a female ECU undergraduate student. After his prior student advisor had disclosed to John Doe that student advisors are intended to act as ECU's source of inside information about a respondent's case John Doe did not feel that the new student advisor was trustworthy. At the one meeting John Doe and his attorney had with the new advisor, she attempted to usurp the role of John Doe's attorney, by stating that she would speak for John Doe at the hearing. This offer was flatly rejected by John Doe and his attorney, though the advisor did attend the hearing.

#### D.  **The Biased Hearing Panel**

135.    Less than 3 days before the hearing, John Doe was provided with information about the panel members that would oversee his Student Conduct Board hearing. The panel was stacked with members who had criminal justice backgrounds and, upon information and belief, preconceived biases against males accused of sexual misconduct. Criminal law is adversarial, while Title IX investigations and adjudications are intended to be inquisitorial.

136.    Panel member and Defendant Bonner spent much of her career researching and writing about gender bias in the police investigation of domestic violence complaints. She is also a member of End Violence Against Women International, a group which promotes "victim-centered, multidisciplinary collaboration, which strengthens the response of the criminal justice system." Bonner has given presentations for the organization which advocate taking a tougher stance on male perpetrators of violence against women.

137.    In 2016, Bonner served as the Local Evaluator for the Domestic Violence Homicide Prevention Demonstration Initiative for Pitt County, North Carolina. The Initiative was funded by the U.S. Department of Justice's Office for Violence Against Women. Bonner has also given presentations for ECU's Gender Studies program. Upon information and belief, Bonner's education and experience caused her to hold gender-biased assumptions about male students accused of sexual misconduct at ECU. Bonner's background in criminal justice further caused her, upon information and belief, to treat males accused of sexual misconduct in a prosecutorial, and adversarial, manner as opposed to the neutral role required by ECU's policies and procedures.

138.    Defendant Skipper, one of the staff panel members assigned to John Doe's case, held a Bachelor of Science degree from ECU in Criminal Justice. Upon information and belief, his background, and ties to the University as an alumnus, caused Skipper to assess the allegations

against John Doe in an adversarial manner which presumed John Doe's guilt rather than his innocence.

139.    Defendant Wilson, described as a "Data Analyst" in the materials provided to John Doe worked in ECU's Office of Equity and Diversity, including conducting research on gender equality. He went on to serve as the Clery Compliance Coordinator for the ECU Police Department. Upon information and belief, Wilson approached John Doe's case in a manner that was biased against males and favorable to females, presuming that all female complainants tell the truth and that all male respondents are guilty.

140.    Hearing panel chair Defendant Flanagan is the Director of Athletic Training Education at ECU. Complainant Jane Roe is a student athlete. Upon information and belief, Flanagan's work, and close camaraderie with ECU's student athletes predisposed her to favor Jane Roe over John Doe in the hearing process.

141.    Nicholas Dube, who acted as Case Presenter at the hearing, also had a background in Criminal Justice, receiving his degree from ECU in 2014. Dube's role at the hearing was to "read[] information that has been collected by the University."

142.    Upon information and belief, all persons involved on the panel that heard John Doe's case, participated in Title IX training conducted by ATIXA, AEquitas and others that fostered use of the trauma informed approach, and a presumption that male respondents are sexual predators, as discussed *supra* at Paragraphs 38-46.

**E.  ECU Denies John Doe Adequate Time to Prepare for the Hearing**

143.    On May 24, 2016 Wordlow emailed a letter to John Doe informing him that he would be permitted to review the investigative file a mere 2 days before the hearing, on May 25, 2016 at 10:30 a.m. John Doe and his attorney were once again presented with a heavily redacted

copy of the file. John Doe's attorney was prohibited from using a recorder to take notes about the file and was prohibited from making copies to use for hearing preparation.

144.     John Doe and his attorney had repeatedly requested access to an unredacted copy of the file which was routinely denied by Wordlow and Messerli on the ground that the information could be used by John Doe and/or his attorney to "retraumatize" or "victimize" individuals involved in the case, that the information could be broadcast by John Doe on social media or that he might attempt to harass or coerce witnesses into not testifying at the hearing. These excuses for not giving John Doe full access to his file further demonstrate gender bias. Wordlow, and ECU administrators were operating under the presumption that John Doe—a male accused of sexual misconduct—was dangerous, menacing and harassing, while the female complainant and her witness, also a female, were viewed as subject to victimization. This also indicated that Wordlow, and others, operated under a presumption of guilt rather than conducting a fair and impartial process.

145.     On May 26, 2016—1 day before the hearing—Mandy Messerli emailed a letter to John Doe informing him that Jane Roe would attend the hearing. The letter also stated that Jane Roes' roommate—M.K. would attend the hearing as Jane Roe's witness.

146.     ECU's continuous, deliberate failure to provide John Doe access to an unredacted copy of the investigative file is but one instance in which his right to a fair hearing was violated, as he and his attorney could not adequately prepare for the hearing by reviewing a redacted copy of the investigation file only two days before the hearing. ECU further violated the Student Conduct Code by failing to provide reasonable access to the information prior to the hearing.

**F. The "Hearing"**

147.    On May 27, 2016—6 months after the filing of Jane Roe's university complaint—a hearing was held to determine whether John Doe was responsible for violating ECU's policies and procedures. On the hearing panel were Bonner, Flanagan, Ragone, Skipper and Wilson.

148.    Defendant Messerli replaced Wordlow as "hearing advisor."

149.    Defendant Bellflower, Associate University Attorney, also participated in the hearing which is not provided for in the Student Conduct Code. Indeed, John Doe was informed only that Bellflower would be available by phone for ECU administrators if questions arose during the hearing. Bellflower had a clear conflict of interest as ECU's attorney and should not have been present at the hearing. Bellflower, who has an extensive history as an advocate for victims of sexual assault, injected gender bias into the proceeding.

150.    Upon information and belief, Bellflower's mere presence at the hearing prejudiced the hearing panel against John Doe and in favor of taking a hard line against male respondents due to increasing pressure on ECU to take Title IX cases seriously. Bellflower's presence at the hearing also turned the hearing into an adversarial proceeding, rather than a neutral, or inquisitorial setting.

151.    During the course of the hearing, Bellflower—rather than the hearing panel chair, Defendant Flanagan—made determinations about the relevance of evidence submitted by John Doe, including polygraph test results which determined that John Doe was truthful in his assertion that the sexual activity that he engaged in with Jane Roe was consensual. Wordlow had approved the presentation of this evidence, and copies of Jane Roe's relevant social media posts, to the panel prior to the hearing date.

152.    Bellflower permitted the introduction of John Doe's arrest photo and a newspaper article about his arrest to be provided to the panel as "evidence" as well as speculative witness

44

statements about John Doe's prior sexual history—there was no allegation of a pattern of conduct in his case nor would the prejudicial evidence have supported such an allegation. The evidence should have been rejected by Bellflower and Flanagan, as the hearing chair. Their failure to exclude such prejudicial evidence from the panel's consideration strongly suggests that Bellflower and Flanagan presumed John Doe was guilty and intended to influence the panel to find that to be the case.

153.    In contrast, Bellflower and, upon information and belief, Flanagan excluded forensic evidence from consideration, including Jane Roe's medical history as related to birth control and the fact that no photos had been produced that corroborated the purported injuries received on the night of the alleged incident. They also disallowed evidence concerning Jane Roe's birth control implant, which was in her left arm. John Doe knew where the implant was located because he and Jane Roe had a conversation about it during their consensual sexual act. Also excluded was evidence that Jane Roe had enrolled at another university, which undermined her statement to the panel that she wanted to finish her degree at ECU in peace and that John Doe should, therefore, be banned from campus.

154.    In justifying these decisions, Bellflower repeatedly cited the Federal Rules of Evidence which were not adopted by the Student Conduct Code. ECU's student conduct procedures are not subject to the Federal Rules of Evidence. UNC Policy Manual § 700.4.1.1.

155.    During recesses at the hearing, Bellflower acted in a menacing manner towards John Doe and his attorney, including by telling John Doe's attorney that his statement to the panel, calling into question the lack of physical evidence of sexual assault, was "uncalled for" and that he "should not have gone there" since the statement had upset Jane Roe. On another recess Bellflower acted in a harassing and intimidating manner toward John Doe. Attempting to justify

his exclusion of Jane Roe's social media posts from consideration by the panel—a decision that was not his to make—Bellflower exclaimed that the panel was "not here to judge the complainant's political views" but determine if John Doe was "guilty of sexual assault." Bellflower's tone insinuated that John Doe was "guilty" and his conduct confirmed John Doe's feeling that he was presumed guilty from the start of the hearing.

156.    During the course of the hearing, chairperson Flanagan acted hostile towards John Doe, even openly admonishing him for not paying attention. Yet John Doe spoke no words at the hearing other than to state his name for the record due to the pending criminal investigation.

157.    John Doe's attorney presented two questions to the panel to be asked of Jane Roe, which Flanagan flatly rejected. John Doe was not permitted to examine Jane Roe or her witness or engage in any meaningful form of cross examination through the panel. This violated UNC's Policy Manual. §700.4.1 at § VI.A.11.

158.    Flanagan permitted Jane Roe's witness, M.K., to present handwritten notes of a phone conversation that the witness purportedly had with John Doe in which she alleged that John Doe admitted to sexually assaulting Jane Roe. The notes were written down at a later time, rather than contemporaneous with the phone call. M.K. began reading her witness statement into evidence as if it were her own, later realizing that she was reading someone else's statement. M.K. testified that John Doe admitted to raping Jane Roe, which contradicted her prior statement to Kristan Tucker that he had only admitted to having sex with Jane Roe. John Doe had no opportunity to question the witness, test the accuracy or credibility of the testimony as he was precluded from questioning M.K.

159. John Doe's student advisor advocated for Jane Roe at the hearing. For instance, when John Doe's advisor sensed that Jane Roe was upset by something said at the hearing, she called for a recess—even though John Doe's attorney was in the middle of speaking to the panel.

160. The hearing panel asked no questions of inexperienced investigator Butler about why she found John Doe responsible for ECU code violations, how she assessed the complainant's credibility, or what evidence she considered in her determination. The panel only confirmed that her investigation was "complete."

161. John Doe was not privy to the deliberations of the hearing panel. Upon information and belief, the panel was strongly influenced by Bellflower and Flanagan to find John Doe responsible for violating ECU's policies and procedures. Moreover, upon information and belief, due to their backgrounds and experience, panel members Bonner, Skipper and Wilson all held biased views against males accused of sexual misconduct, viewing them as sexual aggressors who should be prosecuted to the fullest extent of the law. The panel in John Doe's case was inherently biased against male students and, accordingly, it was impossible for John Doe to get a fair and impartial hearing, even within the parameters set by ECU's Student Conduct Code which, as written, denied John Doe due process.

## G. The Unwarranted Sanction Against John Doe

162. On May 27, 2016, or the same day that the hearing was held, Messerli emailed a letter to John Doe informing him that he was found responsible for "Violation of University Policies" and "Endangerment" which included "engaging in non-consensual sexual contact." The letter still failed to specify the code violations, other than Endangerment, and simply appended over forty pages of codes and regulations.

163.    The letter indicated that the hearing panel relied solely on the testimony of complainant's witness M.K. and the purported telephone call she had with John Doe in which he "confessed" to having non-consensual sex with Jane Roe. The hearing panel further relied on witness statements that were, upon information and belief, obtained from the criminal investigation into Jane Roe's allegations. The witnesses did not give testimony at the hearing and, therefore, the panel did not assess the credibility of these witnesses. The panel further ignored exculpatory evidence that contradicted these witness statements. The panel also took into consideration Jane Roe's request to finish her degree with "piece [sic] of mind" even though, at the time of the hearing, Jane Roe had already decided to transfer to another university—the panel rejected evidence of Jane Roe's decision—as presented by John Doe's attorney at the hearing—on the ground that it was irrelevant.

164.    Messerli's letter stated that she was responsible for sanctioning John Doe, even though the Student Conduct Code required the hearing panel to determine sanctions. Student Conduct Code § 5.4.4.

165.    As result of the biased and inadequate "hearing," John Doe received a 3-year suspension from ECU. His name was also entered into a UNC database so that he could not attend any other university within the UNC system. The information regarding his suspension will also be permanently stored in the UNC database, permanently marked on his transcript and the disciplinary records will be kept indefinitely.

166.    The sanction of suspension did not differ from expulsion in anything other than name—in cases of suspension *and* expulsion a student's records are permanently marked.

167.    John Doe was also banned from ECU's campus and from conducting "official business" with the University. He also had to pay "restitution" to Jane Roe upon her submission of "relevant medical bills."

168.    After the suspension period ended, John Doe could only attend ECU—which he had been attending online—by petitioning for re-enrollment and being accepted. This would require, among other things, proof of counseling and authorization for Messerli to speak with the counselor.

## H.  Defendant Hardy is the Sole Arbiter of John Doe's Appeal

169.    After receiving the hearing outcome letter, John Doe had only five calendar days (which included a weekend) to file his appeal. Though the "hearing" was recorded he did not have access to the recording prior to filing his appeal. John Doe requested access to the recording but Wordlow made no attempt to accommodate him prior to the deadline for submitting his appeal.

170.    Per the Student Conduct Code, the grounds for appeal were: (1) a violation of due process; or (2) a material deviation form Substantive and Procedural Standards. § 5.5.

171.    John Doe appealed on both grounds available. The appeal set forth the following violations and deviations:

(i)     Failure to allow John Doe to comply with his responsibilities under the Student Conduct Code, §4.1.2.4.

(ii)    Application of the Federal Rules of Evidence to the evidence presented by John Doe in order to exclude the same, in violation of UNC Policy Manual § 700.4.1.1.

(iii)   Reviewing uncorroborated character evidence concerning John Doe's sexual history, his arrest photo and a newspaper article concerning the criminal case which was irrelevant and prejudicial.

(iv)    The reliance of the panel upon witness statements that were obtained by informal interviews by improperly trained investigators without appropriate due process protections, including the opportunity for cross-examination.

49

(v)     The blatant omission of rape kit and other forensic evidence from the file.

(vi)    The panel's refusal to ask complainant John Doe's written questions.

(vii)   Reliance on hearsay evidence including the written statements of witnesses who were not present at the hearing.

(viii)  Utilization of M.K.'s handwritten notes of the purported phone conversation with John Doe without John Doe having the opportunity to question M.K. about the notes or the call.

172.    On June 1 and 2, 2016, ECU sent John Doe 5 letters concerning his appeal and what would happen post-submission, including an apology for sending him so much correspondence.

173.    Defendant Hardy, Vice Chancellor for Student Affairs, was the sole person responsible for deciding John Doe's appeal. Hardy had a clear conflict of interest since she was an ex officio member of The Chancellor's Committee on the Status of Women, who took an active role in ECU's Title IX campaign, was ECU's spokesperson for Title IX compliance, and believed that OCR forced universities to take the sexual assault of women seriously, *supra* Paragraphs 50, 56-57, and 62, publicly citing statistics about college women and sexual assault. Hardy's views on sexual assault as a matter concerning women was biased, leading to the conclusion that men are responsible for sexual assault. Upon information and belief, this bias caused Hardy to reject John Doe's appeal despite numerous, obvious defects in the process and a complete lack of evidence that John Doe sexually assaulted Jane Roe.

174.    By letter dated June 21, 2016, Hardy affirmed the outcome of the Student Conduct Board proceeding and the sanction issued thereafter.

175.    In reviewing John Doe's appeal, Hardy discounted John Doe's complaint that he had no meaningful opportunity to cross-examine Jane Roe or the witnesses whose transcribed statements were relied upon by distinguishing ECU's proceeding from a criminal case. "While the University's procedure may not match formal criminal proceedings in state or federal court, a

50

student disciplinary hearing is not such a proceeding." This ignored the UNC Policy Manual's requirements that students accused of "serious violations" must be given "an opportunity to question…evidence, either by direct questions or inquiries transmitted through the committee or hearing official." § 700.4.1. In addition, cases such as John Doe's which involve criminal charges are deemed "special cases" which *at a minimum* permit the student to have an attorney advisor. *Id.* Hardy further ignored that 4 out of 6 questions given to the panel by John Doe's attorney were rejected as "not germane," which is different than relevant—the standard required to be applied to evidence presented at a Student Conduct Board hearing.

176.     Hardy ignored Bellflower's participation in John Doe's case, as well as his reliance on the Federal Rules of Evidence, as the mere "fram[ing] an explanation" to John Doe's attorney as to why the evidence was rejected. In contrast, Hardy found no prejudice in the inclusion of John Doe's arrest photo or the article about his arrest in the materials provided to the hearing panel, and blamed John Doe's attorney for failing to object to the inclusion of those materials in the notebook prior to the day of the hearing. Hardy also found no prejudice resulting from the inclusion of irrelevant hearsay evidence concerning John Doe's sexual history yet she affirmed that evidence of Jane Roe's lifestyle and sexual history should not have been presented to the panel.

177.     Hardy permitted no further appeal to the Board of Trustees, even though the UNC Code permitted a second level of appeal, on the ground that it was discretionary. However, this ignored that students who are suspended face the same life altering sanctions as those who are expelled—ECU keeps their records indefinitely, permanently marks their transcripts and keeps information related to the sanction in the UNC system database.

178.     As a result of Defendants' actions, John Doe suffered tremendous financial harm, including the loss of tuition for the Fall 2015 semester, a significant delay in the completion of his

graduate work, the loss of opportunities with the United State Marine Corps, the inability to continue his graduate studies at any UNC institution and the inability to pursue a career of his choice.

179.    As a result of Defendants' actions, John Doe also suffered tremendous emotional harm, including panic attacks, night terrors and suicidal ideation. In order to manage his stress and anxiety, he was prescribed medication. He continues to use medication as needed to manage his extreme anxiety and panic attacks. Since he was falsely accused by Jane Roe, John Doe has regularly attended therapy.

**COUNT I**
**Violation of Title IX of the Education Amendments of 1972-**
**Erroneous Outcome (Against East Carolina University)**

180.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

181.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

182.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant ECU. ECU is a public university located in Greenville, North Carolina. It has been designated a sea grant university by the Association of Public and Land Grant Universities. ECU is a constituent university of the University of North Carolina. It is authorized, supervised and funded by the State of North Carolina pursuant to the North Carolina Constitution and Section 116-4 of the North

Carolina General Statutes. Between the years 2013 and 2016, ECU received over $20 million per year in grants, contracts and other funding from the U.S. Government.

183. Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

184. An "erroneous outcome" occurred in this case. John Doe was innocent and wrongly found to have committed a violation of ECU's policies, and gender bias was a motivating factor.

185. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[8]

186. The "prompt and equitable" procedures that a school must implement include, at a minimum:

● "Notice . . . of the procedure, including where complaints may be filed";

● "Application of the procedure to complaints alleging [sexual] harassment...";

● "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

● "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

---

[8] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn. 98-101.

53

- "Notice to the parties of the outcome of the complaint......"[9]

187. Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of Jane Roe's complaint and failed to conduct the investigation and adjudication of Jane Roe's complaint within a reasonably prompt timeframe.

188. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon John Doe. These circumstances include, without limitation:

(i)     In the months leading up to Jane Roe's complaint, and in the face of public outcry from its students, ECU ramped up measures to acknowledge and address sexual violence against *women* on campus. Upon information and belief, since January 1, 2015, no females have been accused of sexual misconduct at ECU. Upon information and belief, all males accused of sexual assault since January 1, 2015 have been severely sanctioned;

(ii)    The ECU administrators involved in the investigation and adjudication of the complaint against John Doe received trauma informed training which perpetuated the idea that female victims of sexual assault should never be questioned, that trauma explains away any credibility issues in their stories, and that they tell the truth. This training further focused on males as sexual aggressors, in all instances responsible for obtaining consent. Several of the trainings offered by ECU were run by a women's advocacy group focused on violence against women with a focus on cracking down on male perpetrators;

---

[9] *Id.* at 20.

(iii)     Upon information and belief, ECU's investigator in John Doe's case, Defendant Butler, failed to ask probing questions of Jane Roe about inconsistencies in her story for fear of traumatizing her and presumed John Doe was guilty even though there was no credible, corroborating evidence for Jane Roe's account of what happened;

(iv)     ECU, through Wordlow and Roeder, banned John Doe from campus as an interim remedy on the grounds that he was dangerous, even though John Doe was an online graduate student who did not frequent campus and had no disciplinary record or history of violence, including during the 4 years prior as an ECU undergraduate;

(v)     ECU Student Conduct Board member Bonner, who was on the hearing panel that decided John Doe's case, spent much of her career researching and writing about gender bias (against women) in the police investigation of domestic violence complaints. She is also a member of End Violence Against Women International, a group which promotes "victim-centered, multidisciplinary collaboration, which strengthens the response of the criminal justice system." Bonner has given presentations for the organization which advocate taking a tougher stance on male perpetrators of violence against women;

(vi)     ECU Student Conduct Board member Wilson, who was also on the hearing panel that decided John Doe's case, worked in ECU's Office of Equity and Diversity, and conducted research on equality for women. He went on to serve as the Clery Compliance Coordinator for the ECU Police Department;

(vii)    ECU's attorney Bellflower, a known victim's rights advocate, influenced the hearing panel by presiding over the hearing, and acted in a manner that was hostile, threatening and intimidating to John Doe;

(viii)   ECU faculty member Walsh, the hearing panel chair for John Doe's case, admonished John Doe and treated him in a hostile manner at the hearing, even though he could not speak at the hearing due to pending criminal charges; and

(ix)     ECU's Vice Chancellor of Student Affairs Hardy, solely responsible for deciding John Doe's appeal, made public statements in the months preceding John Doe's case about ECU's need to remedy sexual violence against women and referenced the pressure placed on ECU by OCR. Hardy is an ex officio member of the Chancellor's Standing Committee on Women, which embarked on an advocacy campaign in 2015 to reduce sexual assault against women on campus including by planning and hosting events such as a screening of The Hunting Ground for Pledge Purple Week. Hardy's role as campus spokesperson for Title IX enforcement on behalf of women placed her in a position that directly conflicted with her role in deciding appeals in ECU's Title IX proceedings—the only level of appeal permitted in cases of suspension.

189.    Further, Defendant ECU was encouraged by federal officials during the Obama Administration to institute disciplinary procedures in sexual misconduct cases that abrogate the civil rights of men and treat men differently than women. As publicly acknowledged by Defendant Hardy:

> The 2011 "Dear Colleague Letter" and the "Not Alone" report from the White House in 2014, shifted Title IX "significantly to focus on sexual assault, sexual violence and sexual misconduct. These guiding principles *forced*...colleges and universities to evaluate existing reporting processes associated with Title IX." (emphasis added).

Upon information and belief, Defendant ECU has not modified its disciplinary procedures under the present Trump Administration even though, on September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014 on the ground that the April 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, [and] are overwhelmingly stacked against the accused." *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

190.    Upon information and belief, Defendant ECU possesses communications and documents evidencing Defendants' predisposition to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

191.    Upon information and belief, Defendant ECU has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

192.    Upon information and belief, Defendant ECU's mishandling of Jane Roe's complaint was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds:

(i)    During the time that Jane Roe's allegations against John Doe were being investigated, ECU entered into a resolution agreement with OCR concerning their mishandling of Title IX cases and lack of adequate staff, policies and procedures for handling Title IX complaints. The investigation commenced in October 2014 and was resolved in February 2016, with continuous monitoring of ECU by OCR.

(ii)     Beginning in early 2015, ECU and its administrators faced widespread, public criticism for not doing enough for female students who were victims of sexual assault on campus, including scathing articles in the campus newspaper. Per Hardy, "Sexual assaults are high profile concerns on college campuses around the state and nation…the university is not sitting quietly."

193.    Based on the foregoing, John Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and punished severely for it.

194.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

195.    As a result of ECU's violation of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure John Doe's reputation and right to continue his education, an injunction should issue directing ECU to (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file and the UNC database; and (iv) permanently destroy any record of Jane Roe's complaint.

196.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT II**
**42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process**
**(Against All Defendants)**

197.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

58

198.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

199.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

200.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

201.     A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

202.     John Doe's constitutionally protected property interest in his continued enrollment at Defendant ECU and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by Defendant ECU.

203.     John Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between Defendant ECU and John Doe.

204.     It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

205.     A person who has been admitted to a state university, and who has paid tuition to that university has a protected property interest in continuing his education at that university until he has completed his course of study.

206. ECU is a public university located in Greenville, North Carolina. It has been designated a sea grant university by the Association of Public and Land Grant Universities. ECU is a constituent university of the University of North Carolina. It is authorized, supervised and funded by the State of North Carolina pursuant to the North Carolina Constitution and Section 116-4 of the North Carolina General Statutes. ECU has a duty to provide its students equal protection and due process of law by and through any and all procedures set forth by the University.

207. Plaintiff had obeyed all institutional rules when he was wrongly suspended from ECU.

208. Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff. Plaintiff was deprived of a fundamentally fair process.

209. Plaintiff's right to due process was violated when:

(i)     Defendant Wordlow issued an administrative suspension and registration cancellation on the false ground that he was a danger to the ECU campus community even though John Doe had no disciplinary record, did not attend classes on campus and had substantially completed his finals for the Fall 2015 semester. The suspension was grounded in Wordlow's presumption that John Doe was guilty and John Doe was not provided with the specific details of the ECU "charges" against him or Jane Roe's specific allegations at the time that he was barred from attending classes;

(ii)    Defendant Roeder, vocal on campus as an advocate for victims' rights, violated John Doe's constitutional right to continue his education by denying his appeal of

60

the administrative suspension and registration cancellation even though there was no evidence that he was a danger and the allegations against him had not yet been adjudicated.

(iii)   From the time that John Doe was notified that ECU was conducting an investigation, until the time that he received the outcome letter six months later, ECU failed to notify John Doe of the specific ECU policies and procedures at issue;

(iv)   At all times relevant to John Doe's claims, Wordlow and Messerli denied John Doe access to an unredacted copy of the Title IX investigative file, precluding him from adequately preparing for his appearance before the Student Conduct Board;

(v)   Defendant Butler, who lacked the requisite background and experience was assigned as the Title IX investigator in John Doe's case. Butler investigated the allegations against John Doe under a presumption of guilt and found John Doe "responsible" for violating ECU's policies without notifying him of the specific policies that were violated;

(vi)   Defendant Bellflower, ECU's attorney, denied John Doe a fair hearing by participating in the Student Conduct Board process, engaging in harassing and intimidating behavior towards John Doe during recesses, and influencing the hearing panel members through instructions during the hearing and usurping the role of the hearing panel chair;

(vii)   Defendants Wordlow, Bellflower and Flanagan denied John Doe a fair hearing because they included in the evidence file highly prejudicial information, including John Doe's arrest photo and related newspaper article and hearsay evidence concerning his sexual history. In contrast, they denied John Doe's proffer of

evidence concerning Jane Roe's birth control implant (discussed during the sexual encounter), lack of claimed injuries, lifestyle and acceptance to another university;

(viii)  Defendant Wordlow violated John Doe's right to a fair hearing by intentionally stacking the hearing panel with faculty and staff who had criminal justice backgrounds and experience as advocates for female victims of sexual violence and gender inequality. Upon information and belief, said panel members operated under a presumption of guilt;

(ix)  Defendants Bonner, Flanagan, Ragone, Skipper and Wilson, all hearing panel members in John Doe's case, violated John Doe's right to due process by denying him the opportunity to ask questions of Jane Roe and her witness on the ground that they were "not germane" and relying on transcribed witness statements which could not be tested through cross examination;

(x)  Defendants Bonner, Flanagan, Ragone, Skipper and Wilson, all hearing panel members in John Doe's case, violated John Doe's right to due process by failing to apply the preponderance of the evidence standard to the evidence before them, instead presuming John Doe was guilty, looking for evidence to back up that presumption and ultimately relying on a witness' account of a conversation with John Doe that could not be proven, and whose testimony contradicted her earlier statements to Defendant Tucker;

(xi)  Defendant Hardy, aware of the recently resolved OCR investigation at ECU, concerned with ensuring ECU's compliance with Title IX and tasked with responding to the outcry of female students that their sexual assault complaints were not taken seriously, denied John Doe due process by, upon information and

62

belief, deliberately overlooking the procedural defects and policy violations outlined in his appeal and by denying him the right to appeal to the Board of Governors of UNC even though John Doe's suspension carried the same punishment as if he had been expelled.

Upon information and belief, these Defendants knew or reasonably should have known that their actions would violate John Doe's constitutional rights. The above described actions, which clearly disregarded Plaintiff's constitutional rights, cannot reasonably be characterized as actions taken in good faith.

210.    Upon information and belief, the Defendants were pressured by the OCR investigation and the 2011 Dear Colleague Letter which, per Defendant Hardy "forced" universities to take sexual assault allegations more seriously. This pressure forced Defendants to act in derogation of male respondents' due process rights, including Plaintiff's, by engaging in a disciplinary process tainted by gender bias. As a result, the Defendants failed to apply even those standards mandated by the 2011 Dear Colleague Letter.

211.    Demonstrating its conformity to the pressure imposed by the OCR investigation and the 2011 Dear Colleague Letter, ECU's 2017 Clery Report, an annual disclosure of campus crime statistics, revealed that the number of sex offenses ("Rape," "Fondling") investigated annually at ECU, between 2014 and 2016, more than doubled during the time in which ECU was under OCR investigation. For example, there were 7 reported rapes on campus in 2014; 17 reported rapes on campus in 2015; and 16 reported rapes on campus in 2016. The OCR investigation at ECU was commenced in October 2014 and ECU entered into a resolution agreement with OCR in February 2016 with continued monitoring.

212.    Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including but not limited to, his right to be notified of the charges against him, his right to a fair adjudication, his right to be heard by an impartial factfinder, to question his accuser, to challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense.

213.    Defendants failed to provide Plaintiff with the basic due process protections that they were required to provide students accused of sexual misconduct at a state university.

214.    Defendants, as well as other agents, representatives and employees of ECU were acting under color of state law when they showed intentional, outrageous and reckless disregard for Plaintiff's constitutional rights.

215.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

216.    Accordingly, Defendants Hardy, Wordlow, Butler, Roeder, Bonner, Flanagan, Ragone, Skipper, Wilson, Messerli and Bellflower, in their individual capacities, are liable to Plaintiff in violation of § 1983 for violations of the Due Process Clause of the Fourteenth Amendments, and for all damages arising therefrom.

217.    As a result of ECU's, and Chancellor Staton's, agreement to and ratification of Defendants' violation of Plaintiff's due process rights, which resulted in an unduly severe and unwarranted sanction which continues to injure John Doe's reputation and right to continue his education, an injunction should issue directing ECU and Chancellor Staton to (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file and the UNC database; and (iv) permanently destroy any record of Jane Roe's complaint.

## COUNT III
### Breach of Contract
### (Against ECU)

218.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

219.   At all times relevant hereto, a contractual relationship existed between ECU and John Doe through ECU's policies and procedures governing the student disciplinary system, including but not limited to the Student Conduct Code and the UNC Policy Manual, which is incorporated by reference in the Code.

220.   Through the documents it publishes and provides to students, Defendant ECU makes express contractual commitments to students involved in a disciplinary process.

221.   Based on the foregoing, ECU created express and implied contracts with John Doe.

222.   The contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

223.   Based on the aforementioned facts and circumstances, Defendant ECU breached express and/or implied agreement(s) with John Doe.

224.   Defendant ECU committed several breaches of its agreements with John Doe during the investigation and hearing process, including, without limitation:

a)   Violations of the UNC Policy Manual § 700.4.1 as follows:

(i)   Subjecting Plaintiff to an arbitrary and capricious outcome not supported by the evidence. § III.

(ii)   Failing to provide written notice that "specifies the offense(s) charged" and contains a "brief recitation of the facts supporting the charge." § VI.A.2.

(iii)   Due to heavy redactions in his file, failing to provide Plaintiff the opportunity to review the written evidence used at the hearing. § VI.A.6.

65

(iv)     Denying Plaintiff the opportunity to present evidence and defenses at the hearing. § VI.A.8.

(v)      Denying Plaintiff the opportunity to question the evidence. § VI.A.11.

(vi)     Permitting Jane Roe to have an advocate and support person at the hearing, while allowing John Doe only his attorney. § VII.C.

b)      Violations of the Student Conduct Code as follows:

(i)      Implementing an administrative suspension absent any substantial threat of harm. § 3.1.2.

(ii)     Failing to provide Plaintiff with resources appropriate for respondents, but only geared toward complainants. § 3.1.1.

(iii)    Failing to provide Plaintiff with any explanation or assistance concerning reporting a crime to campus or local law enforcement in the event that he wished to file a complaint against Jane Roe. § 3.1.1.

(iv)     Failing to consider evidence that Jane Roe intended to transfer to another university when determining Plaintiff's sanctions. § 3.2.

(v)      Failing to objectively and impartially evaluate Jane Roe's complaint. § 4.1.

(vi)     Failing to give Plaintiff reasonable access to *all* information gathered during the course of the investigation. § 4.1.

(vii)    Failing to apply the preponderance of the evidence standard. § 5.1.3.

(viii)   Failing to provide Plaintiff with the requisite written notice of the allegations against him. § 5.2.5.

(ix)     Failing to timely refer the case to the Student Conduct Board. § 5.2.5.2, 5.4.1.

(x)      Failing to specify, in writing, the "charges" against Plaintiff. § 5.4.1.

(xi)     Allowing Defendant Messerli, rather than the hearing panel, determine sanctions. § 5.4.4.4.

(xii)    Speaking to the press about John Doe's education records without his written consent. § 6.

> (xiii)  Failing to follow the Student Conduct Code by permitting Defendant Bellflower to participate in the hearing.

(c)  Violations of the Interim Sexual Misconduct Regulation as follows:

> (i)  Failing to provide a prompt, fair and impartial process. § 6.6.1.

> (ii)  Failing to provide notice to Plaintiff that the investigation and adjudication process would take more than 60 days. § 6.6.1.

> (iii)  Taking six months to complete the investigation and adjudication of Jane Roe's complaint. § 6.6.1.

> (iv)  Failing to provide information to both parties with respect to filing criminal charges. § 6.4.1.

225.  Based on the aforementioned facts and circumstances, Defendant ECU breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with John Doe.

226.  As a direct and foreseeable consequence of the foregoing breaches, John Doe sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

227.  As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

> (i)  on the first count for violation of Title IX of the Education Amendments of 1972, a judgment against ECU awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against ECU As a result of ECU's violation of Title IX, which resulted in an unduly severe and unwarranted sanction which

67

continues to injure John Doe's reputation and right to continue his education, an injunction should issue directing ECU to (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file and the UNC database; and (iv) permanently destroy any record of Jane Roe's complaint;

(ii)    on the second count for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against individual Defendants Hardy, Wordlow, Butler, Roeder, Bonner, Flanagan, Ragone, Skipper, Wilson, Messerli and Bellflower awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and as against Defendants ECU and Staton an injunction directing ECU and Staton to (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file and the UNC database; and (iv) permanently destroy any record of Jane Roe's complaint;

(iii)    on the third count for state law breach of contract, a judgment against ECU awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    an injunction directing ECU to (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file and the UNC database; and (iv) permanently destroy any record of Jane Roe's complaint; and

(v)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

68

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: August 7, 2018

Respectfully Submitted,

NESENOFF & MILTENBERG, LLP

By: _____
    Andrew T. Miltenberg, Esq.
Kara L. Gorycki
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com
*Attorneys for Plaintiff John Doe*

            -and-

WHITE & ALLEN

By: _____/s/ Matthew S. Sullivan_____
    Matthew S. Sullivan
106 S. McLewean Street
P.O. Box 3169
Kinston, NC 28502-3169
msullivan@whiteandallen.com
Phone: (252)527-8000
Fax: (252)527-8128
State Bar No. 22343
***Local Civil Rule 83.1 Counsel for Plaintiff John Doe***